UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID HIEBER,                                             Case No. 22-11417

      Plaintiff,                                       F. Kay Behm
v.                                                       United States District Judge

OAKLAND COUNTY, *et al.*,

      Defendants.
_____ /

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF No. 63)**

**I.     PROCEDURAL HISTORY**

Plaintiff, David Hieber, filed this lawsuit against his former employer,

Oakland County, and Kyle Jen, the Director of Management and Budget for

Oakland County.  Hieber asserts claims of age discrimination under 42 U.S.C.

§ 1983 and the Elliott-Larsen Civil Rights Act (ELCRA), a violation of his due

process rights, a First Amendment retaliation claim, and a defamation claim.  (ECF

No. 4).  Defendants filed a motion for summary judgment, which is fully briefed.

(ECF Nos. 63, 64, 72, 73).  The court held a hearing on the motion on March 20,

2024.

For the reasons set forth below, Defendants' motion for summary

judgment is **GRANTED**.

1

## II.    FACTUAL BACKGROUND

Oakland County (the "County") is currently led by Oakland County

Executive David Coulter, who has been in this role since August 2019. Executive

Coulter assumed the position after the former County Executive L. Brooks

Patterson passed away.  Following Coulter's appointment, several Patterson

administration employees stayed on with the Coulter administration during the

transition and beyond.  (PB at 8:22-12:18, LVP at 6:17-7:5, 9:5-10:3, 35:3-12; RW

at 4:2-3, 5:19-23, 8:25-9:6; JF at 7:3-4).[1]  On December 30, 2020, Defendant Kyle

Jen was appointed as the County's Director of Management and Budget, and as

such Jen is responsible for overseeing the County's Equalization Department (the

"Department").  (KJ at 6:16-7:18).

Hieber was hired by the County in 1994.  (DH at 52:8-11).  He was

considered a merit system employee, meaning he was not appointed by any

particular administration.  (PB at 97:14-98:20). As such, Hieber was subject to the

County's Merit Rules and Non-Discrimination policy.  (Ex. 13).  The Merit Rules

allowed Defendants to terminate Hieber only for "just cause" as defined by Merit

---

[1] Deposition transcripts are cited to by the deponents' initials, rather than number:
Plaintiff ("DH"), Kyle Jen ("KJ"), Phil Bertolini ("PB"), Laurie Van Pelt ("LVP"), Julie Fisher ("JF"),
Rosie Wood ("RW"), Hilarie Chambers ("HC"), April Lynch ("AL"), Dave Woodward ("DW");
Jennifer Hain ("JH"), Michael McCabe ("MM"), and Ashley Young ("AY").

Rule 8.3 and afforded him the procedures under Merit Rule 10, titled "Personnel

Appeal Board."  *Id*.  Hieber held the Equalization Officer position for 19 years until

his termination in November 2021. (DH at 70:10-16).

On September 1, 2020, Hieber led a Zoom meeting with Department chiefs

and supervisors, including Bryan Paris (Hieber's subordinate).  (DH 131:5-133:1;

ECF No. 63-15).  During the meeting, Hieber received a text from his daughter,

who told him that her high school math teacher asked students in the class about

their preferred pronouns.  (DH at 120:6-23).  According to Paris, unprompted and

with "disdain," Hieber said to the meeting participants that the question was

unnecessary and acknowledged that his comment "didn't serve a business

purpose."  (*Id*.; ECF No. 63-15; ECF No. 63-16 at 1).  Paris, who identifies as openly

gay, was upset by Hieber's dismissive attitude.  (ECF No. 63-16 at 1-2, 6; ECF No.

63-17 at 8-10).  Paris filed a complaint about Hieber's comment (as well as other

concerns about bullying and biases), calling it "part of a broader pattern of

behaviors that have made it clear to (him) that Mr. Hieber discriminates..." (ECF

No. 63-15; ECF No. 63-16).  Paris also stated that Hieber "engaged in

discriminatory behavior which I believe was meant to harass and intimidate me as

a member of the LGBT community," and that his "bullying is a long-standing

problem that has endured because he was protected by members of the former

administration….”  (ECF No. 63-15).  Paris stated that “we are within days of an election in which the administration could change and once again the county could be under leadership of individuals that do not believe that a diverse and inclusive environment, which is free from harassment and bullying.”  *Id*.

The County opened an investigation into this complaint, during which nine employees (including Hieber) were interviewed.  (DH at 135:6-19; ECF Nos. 64-1, 64-2).  During these interviews, Defendants say multiple other employees voiced that there was a culture of intimidation in the equalization department.  (ECF Nos. 63-17, 64-1).  Hieber disputes this characterization, arguing that the only time “intimidation” is stated in the investigative report is on page six, notes from Jocelyn Isenberg’s interview, which reads, “Isenberg stated she doesn’t fear retaliation or intimidation,” and page seven, notes from Tiffany Jacob’s interview, that states, “There are no feelings of fear or intimidation, and overall the morale is good Jacob thinks that this complaint may have something to do with Paris, as he is the only one she recalls being upset over the past few months.”  *Id*. However, Isenberg also said that she would not want to be on Hieber’s “bad side” because he gives the “cold shoulder,” does not like conflict, and would rather talk about people behind their backs.  (ECF No. 64-1, PageID.1112).  Further, employee Amanda Mitchell revealed in her 12/22/20 interview that she did not

personally feel intimidated, but others felt intimidated and there were fears of

possible retaliation.  (ECF No. 63-17, PageID.1093-94).  In her 11/20/20 interview,

Tracy Jones indicated that staff were encouraged to "obstruct and intimidate"

and it had been this way her entire career as a supervisor under Hieber.  (ECF No.

64-1, PageID.1108).

As a result of the investigation, no evidence of discrimination was found

and the description of the Equalization Department as corrosive and fear-based

was not substantiated.  (ECF No. 64-1, PageID.1114).  Coaching for Hieber and

other chiefs was recommended.  (ECF Nos. 64-1, 64-3).  It was also recommended

that a "cultural assessment" of the entire department take place.  (ECF No. 64-3,

PageID.1132).  Hieber subsequently participated in coaching sessions related to

his management style and (in his words) "the pronoun deal."  (ECF No. 64-4, DH at

148:11-149:14).  Hieber himself testified that he made minimal changes in

management style after these sessions.  (DH at 146:16-148:7, 150:3-22; see also

450:23-452:10).

In November 2020, the County was in the process of implementing a

Separation and Retirement Incentive (the "Incentive") to address the County's

fiscal needs.  (ECF No. 64-5).  All County employees, regardless of tenure, were

eligible to participate in the entirely voluntary Incentive.  (*Id*.; AL 18:20-18:23;

20:19-21:2, 24:17-25:5).  The Incentive was managed by Deputy County Executive and Human Resource Manager, April Lynch.  (AL at 14:24-15:7, 15:24-16:1, 18:6-23, 19:9-12).  The County had implemented similar incentive programs in the past.  (LVP at 87-88).  Hieber points out that Lynch was known for calling older workers "grandmas," "old timers" and "deadwood."  (ECF No. 72-8).  The Incentive was approved on December 7, 2020.  (ECF No. 64-5).  Lynch indicated that the purpose behind the initiative to encourage retirement was that it would "enable us to prepare a workforce for the future; one that is competitive, nimble, and reflective of the diversity of our county."  *Id*.  Hieber did not opt in to the Incentive, nor was he told he had to do so.  (DH at 542:8-17; KJ at 14:14-22).

Sometime in August or September 2021, a long-time subordinate of Hieber, Robert Doyle, raised his concerns about the work environment fostered by Heiber.  (JF 22:11-22:19, 24:4-24:11).[2]  Hieber admits that he had no reason to believe that Doyle discriminated against him.  (DH at 173:23-174:18, 180:6-23).  Around this time, the County circulated an anonymous voluntary survey about diversity, equity, and inclusion in the County.  (DH at 162:17-25, 542:17-543:15).  On October 18, 2021, Paris filed a grievance with the newly formed union about

---

[2] Hieber maintains that Doyle did not complain until October 21, 2021 when he sent the email to Wood.  However, Fisher testified that Doyle complained to her about a month or two before Hieber was placed on administrative leave, which was on October 21, 2021.  (ECF No. 63-6, p. 24; ECF No. 64-16)).

Hieber, reporting that Hieber was heard by multiple employees "openly bashing" the survey and saying he would lie about the survey.  Paris also complained that Plaintiff's "continued behavior…creates a hostile work environment…"  (ECF No. 64-6).

The next day, the County opened an investigation into this grievance.  (*Id*.; KJ at 18:25-19:13, 76:22-77:4).  Paris's report that Hieber was discouraging people to take the survey and that he would not be honest about his answers to the survey was substantiated by other employees who were interviewed during the investigation.  (ECF Nos. 64-7, 64-8, 64-9).  Additional interview comments about Hieber included:

> a. Plaintiff was reported to have once said, "I don't want some flamer working in there" when the clerical department was considering hiring a male employee for its otherwise all female department.  (ECF No. 64-10, at 6-7; ECF No. 64-15).
>
> b. Plaintiff said about Paris, "That motherfucker, I have a livelihood and he could have made me lose my livelihood and he didn't know who he was messing with…he screwed up." (ECF No. 64-8, at 5; ECF No. 64-15; RW at 18:2-19:23).
>
> c. An employee told investigators about the time when an employee committed suicide. That employee had been dating another County employee. When that County employee began dating someone new, Plaintiff said, "What's the over under or what are the odds on

7

him blowing his head off?" (ECF No. 64-10, at 8-10; ECF No. 64-15).

D. Plaintiff told an employee something like "somebody should just kill them all" referencing Black Lives Matter protestors. (ECF No. 64-11 at 17-18; ECF No. 64-15). He also said, "We've got to be really careful with this one" while rubbing his arm when talking about taking potential disciplinary action against a Black employee. (ECF No. 64-11 at 18-19; ECF No. 64-15). He also expressed concerns about hiring a single mother because he didn't think she could be dependable. (ECF No. 64-11 at 20; ECF No. 64-15).

e. Plaintiff had difficulty appreciating the importance of mental health issues, diversity issues, and COVID precautions. (*See* ECF Nos. 64-7, 64-9, 64-12, 64-13).

f. Plaintiff was referred to as "a psychopath" and "very manipulative." (ECF No. 64-9 at 4; ECF No. 64-10 at 11; see also ECF Nos. 64-11, 64-13). Plaintiff was described as "very charming and charismatic" but also "maniacal" and that "everything he does he has an alternate move (sic)." (ECF No. 64-8 at 5-6; ECF No. 64-9 at 5). One employee felt "abused" and like Plaintiff was "always playing mental games…always trying to pit…people against each other." (ECF No. 64-9 at 10; see also ECF Nos. 64-7, 64-10, 64-11).

g. Someone said that Plaintiff yelled "many times" and didn't talk to her "for years," and it is "absolutely" better to be on his good side. (ECF No. 64-14 at 11-12).

h. With Plaintiff, "there could not be more of a toxic, hostile work environment, retaliation, intimidation," and he was "retaliating against employees. Targeting employees." (ECF No. 64-8 at 2). He created a "toxic" work environment using "a lot of intimidation tactics."

(ECF No. 64-12 at 3; see ECF Nos. 64-10, 64-11, 64-12, 64-13, 64-15).

Interviewees also expressed fear for their safety, including fears of workplace violence by Plaintiff.  (ECF No. 64-8 at 29-30; ECF No. 64-12).  One employee told the investigators that he drove his wife's car to the interview because "it wouldn't surprise me if he would have been sitting in the parking lot wondering who came in. That's how it is." (ECF No. 64-10 at 14).[3]  Defendants suggest that employee fears were not unwarranted, because Hieber had previously followed a female employee from work because he suspected she was having an affair.  Hieber testified that he did not know where she was going but followed her because he "just had suspicion that something just didn't seem right," and he "didn't know (he) was doing it until (he) did it."  (DH at 101:22-105:12, 111:1-114:17; LVP at 60:17:24).

At the conclusion of the investigation into the October 2021 complaint by Paris, Labor Relations personnel drafted a summary of their findings, and a meeting was held to determine next steps.  (RW at 18:12-21:20, 23:21-24:2, 42:1-3, 43:2-22; 44:10-16).  Given concerns raised during the investigation, Labor

---

[3]  Hieber suggests that it is not clear from Glenn's interview that he is referring to Hieber here.  However, the entire purpose of the interview was to discuss Hieber, as made clear at the outset of the interview.  (ECF No. 64-10, pp. 2-3).

Relations decided to place Hieber on administrative leave pending the

investigation's conclusion and remove him from County premises.  (KJ at 22:12-

23:18, 27:16-28:10; AL 50:12-14, 51:20-52:2; JF at 52:10-14, 72:17-73:24; MM at

12:2-19, 22:17-23:19; RW at 47:22-48:16, 50:17-19, 52:25-53:13; 54:12-55:18).

The County placed Hieber on administrative leave on October 21, 2021.  (ECF No.

64-16; DH at 168:13-19).  Fisher informed Hieber of this in-person and provided

him with written notice.  The written notice informing Hieber that he was placed

on administrative leave also informed him that he was not to engage in certain

conduct designed to ensure employee safety and to prevent Plaintiff from

intimidating potential witnesses in the investigation, given early reports received

during the investigation.  (KJ at 36:1-37:8).  More specifically, the notice directed

Hieber to not have any contact with any subordinate employee, not conduct any

County business, not come onsite to any county property, and return his ID

badge, county cell phone, keys and any other County issued property.  (ECF No.

64-16).  Two plainclothes officers wearing polo shirts and lanyards appeared with

Fisher given the safety concerns voiced by employees who worked with Hieber.

(DH at 168:20-169:10, 208:1-213:21, 214:12-217:2, 480:4-13; JF at 52:10-14,

72:17-73:24; RW at 47:22-48:16, 50:17-19, 52:25-53:13; 54:12-55:18).

On October 22, 2021, following conversations with Labor Relations and others in County Executive leadership, Jen sent an email to employees in the Equalization Department to ensure the smooth continuation of operations and promote employee safety.  (ECF No. 64-17; KJ at 41:6-42:20, 45:24-53:13; JF 39:15-40:10).  In the email, Jen informed Equalization Department employees that the County had placed Hieber on administrative leave.  (ECF No. 64-17).  Jen also reminded employees of the protections provided by the Whistleblower Protection Act and reiterated that it was his "goal to ensure that employees work in a safe environment free of intimidation, coercion, harassment, retaliation or discrimination."  *Id*.  To this end, Jen also provided safety instructions on where to park and how to enter and exit the building.  Employees were also informed to call 911 if they perceived immediate danger.  *Id*.

On November 12, 2021, Hieber and his counsel met with the County's corporate counsel.  (ECF No. 64-18; DH at 232:22-242:11). The parties discussed that Hieber did not have the right to union representation, and Hieber was asked about concerns reported during the investigation.  (ECF No. 64-18; DH at 232:22-242:11, 246:20-248:19).  Based on the investigation's findings, Jen determined it would be appropriate to proceed with terminating Hieber's employment.  (KJ at 30:17-31:10).  Jen formally decided this after the Executive Leadership Team was

briefed on the investigation and reached a consensus that termination was

appropriate.  *Id*.; HC at 5:21-6:1.  A Notice of Intent to Dismiss was sent to

Hieber's attorney on November 22, 2021.  (DH at 122:17-21, 270:1-17, 272:5-18;

ECF No. 64-13).  The Notice set forth the reasons for Hieber's termination, which

included comments and behavior by Hieber that were uncovered during the

investigation, and an explanation of the Merit System Rules he violated.  Enclosed

with the Notice were also the guidelines for Pre-Termination Hearings.  *Id*.

According to the County, Hieber's termination followed two steps: a pre-

termination *Loudermill* hearing followed by an evidentiary-style Personnel Appeal

Board ("PAB") hearing.  (ECF Nos. 64-15, 64-19).  Hieber maintains that

Defendants did not comply with these procedures.  The *Loudermill* hearing was

held on November 23, 2021, during which Hieber was informed again of the

reasons for his termination, and he acknowledged that he had been provided with

the County's bases for his termination.  (ECF No. 64-20 at 4:6-5:15).  During the

hearing, Hieber and his attorney were also provided with the opportunity to make

a statement and ask questions.  *Id*. at 5:16-23, 6:1-8.  Hieber was also told that

"this is not the time (Plaintiff) would plead his case, that would be done afterward

through the Personnel Appeal Board process."  (ECF No. 72-20; *see also* ECF No.

64-20, p. 6).  They were then informed that Hieber would have the opportunity to

further challenge the action taken through a PAB hearing. *Id*. Following the *Loudermill* hearing, the Labor Relations Hearing Officer issued a Decision to dismiss Hieber from employment consistent with the Merit System Rules, effective November 23, 2021. (ECF No. 64-21). The Decision of Dismissal included instructions on Hieber's ability to appeal his termination. *Id*.; DH at 280:1-283:4. On November 24, 2021, Hieber received a letter informing him of his termination. (ECF No. 64-22).

On November 24, 2021, Jen sent an email to Equalization Department employees informing them of Hieber's termination and giving safety instructions. (ECF No. 64-23). Like the October email, this email was to ensure the "physical and psychological safety" of employees. (KJ at 61:11-67:23; JF at 20:17-21:13; AL 34:20-35:13).

Following the *Loudermill* hearing, Hieber appealed the decision to terminate his employment to the County's PAB, which he was permitted to do under County policy. (ECF No. 64-24). During the PAB process, Hieber was afforded a hearing, during which he would have the opportunity to present evidence, including live witness testimony, to refute the bases for his termination. (ECF No. 64-19; DW 15:13-16:2). PAB hearings are held before a panel of three individuals, one of whom is elected by County employees. (DH at 359:6-22).

13

Hieber's PAB panel consisted of Commissioner David Woodward, Barry Lepler, and Gloria Harsten Spann.  (ECF No. 64-25).  Lepler and Harsten Spann are not County employees.  (DW at 21:1-22:4).  Defendant's Deputy County Executive, Hilarie Chambers, made it known to Lynch and to Coulter that she was "besties" with Bary Lepler.  (ECF No. 72-24; ECF No. 72-25, at 5).

Ahead of the PAB hearing, Hieber contacted 10 potential witnesses, including current employees of the County, and he obtained at least four witness statements.  (DH at 337:15-339:5, 339:11-340:19; JH 9:18-10:22; PB at 80:10-22, ECF Nos. 64-26, 64-27).  Hieber says he had a right to subpoena and call witnesses by affidavit under the Merit rules but was not allowed to do so at the hearing. (ECF No. 72-2).  The Merit rules say nothing about the submission of affidavits in lieu of testimony.[4]  Moreover, the Procedural Guidelines For Conducting Personnel Appeal Board Hearings specifically provides that "[a]ffidavits of unavailable witnesses, which address non-substantive issues, may be admitted by the Chair."  (ECF 64-19, PageID.1397).  Unless Hieber sought to submit affidavits from witnesses who were both unavailable and were providing testimony on non-substantive issues, this provision does not apply either.

---

[4] Hieber highlights a provision regarding the submission of affidavits in support of a motion for disqualification of a board member, but that does not apply here.  (ECF No. 72-2, PageID.2349).

Hieber sent seven emails to Defendants' counsel asking for witness cooperation for Hieber's PAB hearing.  (ECF No. 72-27).  The County's corporation counsel also reassured Hieber's counsel that he would "make all efforts possible" to ensure witness cooperation for Heiber.  (ECF No. 64-28).  This promise was reiterated at Hieber's PAB hearing.  (10:12-11:1, 14:11-21, 16:6-14; DW at 39:19-40:1, 40:23-41:16).  Hieber's PAB hearing was originally scheduled for December 20, 2021, but the County agreed to move the PAB hearing to allow him to prepare with his new counsel.  (DH at 357:5-14, 373:16-23).  At Hieber's counsel's request, the County also agreed to hold the PAB hearing over Zoom.  (DH 364:10-20, 551:17-554:11).  During the first day of the PAB hearing, the County explained its lack of subpoena power with respect to witnesses.  Consistent with the PAB hearing rules, the PAB panel members also requested that all testimony come from witnesses, rather than through affidavits.  (ECF No. 64-25 at 14:14-16:14; DW at 36:1-37:15).  While the PAB hearing rules indicated that the Board may subpoena witnesses and documents as necessary, the panel chair made clear that the panel did not have subpoena power under the law.  (ECF No. 72-2, PageID.2395, § 11.5.4; ECF No. 72-23, PageID.2742-43).

Both sides made opening statements, and the County put on Brian Paris as a witness, who Hieber's counsel cross-examined.  (ECF No. 64-25 at 19-27, 29-44,

44-57).  However, the PAB hearing was not completed in one day due to time

constraints, and due to limitations from both sides, the parties were unable to

reschedule the second day of the PAB hearing until a later date.  (*Id*. at 66:3-21).

Hieber decided to not complete the PAB hearing, calling it a "waste of time."  (DH

at 383:9-384:2, 550:14-19).  The PAB process concluded given his withdrawal.

## III.    ANALYSIS

### A.    Standard of Review

When a party files a motion for summary judgment, it must be granted "if

the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party

asserting that a fact cannot be or is genuinely disputed must support the

assertion by: (A) citing to particular parts of materials in the record . . .; or (B)

showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to

support the fact."  Fed. R. Civ. P. 56(c)(1).  The standard for determining whether

summary judgment is appropriate is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v.

McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby,*

16

*Inc.*, 477 U.S. 242, 251–52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and to do so must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party only needs to demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario*, *Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252–53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it carries the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

B.    Age Discrimination Claims

    1.    *Section 1983*

Defendants argue that Hieber's age discrimination claim under § 1983 is

preempted by the Age Discrimination in Employment Act (ADEA).  The parties

acknowledge that the Sixth Circuit has not yet addressed whether the ADEA

preempts age discrimination claims brought under § 1983.  However, another

District Judge in this district has addressed the issue, as well as other Circuit

Courts of Appeal, which evidences a circuit split.  *Fink v. Genesee, Cnty. of*, 2023

WL 3571915, at *10 (E.D. Mich. May 19, 2023), reconsideration denied, No. 22-

10107, 2023 WL 4408438 (E.D. Mich. July 7, 2023) ("In sum, the First, Third,

Fourth, Fifth, Tenth, and D.C. Circuits have held the ADEA preempts all § 1983 age

discrimination cases, regardless of whether they stem from a violation of the

ADEA itself or the Equal Protection Clause.  The Seventh Circuit is the only circuit

to have held the ADEA does not preempt § 1983 claims for age discrimination in

violation of the Equal Protection Clause.") (citation omitted).  Notably, the court

applies the same standards to a § 1983 discrimination claim as it would to a

discrimination claim brought under ELCRA.  *Thompson v. City of Lansing*, 410 F.

App'x 922, 934 (6th Cir. 2011) ("(D)iscrimination brought under § 1981 and § 1983

are analyzed under the same standards as Title VII and ELCRA discrimination

claims"); *see also Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) ("the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983").  Below, the court has determined that Hieber's age discrimination claim under ELCRA fails as a matter of law because he cannot establish a prima facie case.  Thus, the court need not resolve the issue of whether an age discrimination under § 1983 is preempted by the ADEA because, even if it were not preempted, any such § 1983 claim would rise or fall with the ELCRA claim because the applicable standard is the same.  Thus, because Hieber's age discrimination claim under the ELCRA fails, any age discrimination claim he has under § 1983 must also fail.  Accordingly, to the extent Hieber can bring an age discrimination claim under § 1983, it must fail for the same reasons outlined below.

   *2. ELCRA*

   Hieber alleges that he was discriminated against and discharged based on his age in violation the ELCRA.  The Sixth Circuit reviews claims of discrimination brought under the ELCRA under the same standards as claims brought under Title VII.  *Ladenberger v. Plymouth-Canton Cmty. Sch.*, 2018 WL 3914709, at *5 (E.D. Mich. Aug. 16, 2018) (citing *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 499

(6th Cir. 2011)).  A plaintiff may rely on direct evidence of discrimination, which is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp*., 176 F.3d 921, 926 (6th Cir. 1999).  Absent direct evidence of discrimination, a plaintiff may rely on circumstantial evidence to establish a case of gender discrimination under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Hieber does not rely on a direct evidence theory and thus, the analysis here proceeds under the *McDonnell Douglas* framework.  To establish a *prima facie* case for Title VII gender discrimination under that framework, Hieber must show that: (1) he belongs to a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) that the job was given to a person outside the protected class or that he was treated differently than a similarly situated, non-protected employee.  *Abdulnour v. Campbell Soup Supply Co.,* 502 F.3d 496, 501-02 (6th Cir. 2007); *Lyons v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 416 F. App'x 483 (6th Cir. 2011).  If a plaintiff establishes a *prima facie* case, the defendant can rebut it by articulating a legitimate non-discriminatory reason for its action.  *Id.*  Thereafter, a plaintiff has the burden of showing, by a preponderance of the evidence, that the legitimate asserted reason

21

was not the actual reason for the defendant's actions, but in fact was pretext for

gender discrimination. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

A plaintiff may establish that the defendant's proffered reason is mere pretext by

establishing that it: (1) has no basis in fact; (2) did not actually motivate plaintiff's

termination; or (3) was insufficient to warrant plaintiff's termination. *Abdulnour*,

502 F.3d at 502 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078,

1084 (6th Cir. 1994)).

Defendants challenge Hieber's discrimination claim based on circumstantial

evidence under the *McDonnell Douglas* burden-shifting paradigm. Defendants

challenge two elements of the prima facie case – that Hieber was subject to an

adverse employment action and that he was treated less favorably than a

similarly situated employee. Under applicable law, to establish that he was

treated differently than similarly situated employees, Hieber must show that he

and his proposed comparators were similar in all relevant respects. *Ercegovich v.*

*Goodyear Tire & Rubber Co*., 154 F.3d 344, 353 (6th Cir. 1998). In every case, the

court must make an "independent determination" of what factors are relevant,

and that determination depends on whether certain factors "are meaningful to

the particular claim of discrimination presented." *Rembert v. Swagelok Co.*, 2023

WL 3094546, at *7 (6th Cir. Apr. 26, 2023) (quoting *Bobo v. United Parcel Serv.,*

*Inc.*, 665 F.3d 741, 751 (6th Cir. 2012), abrogated on other grounds by *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)); *see also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (explaining the necessity of independently determining factors relevant to this inquiry).  Ordinarily, "to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jordan v. Mathews Nissan, Inc.*, 539 F. Supp. 3d 848, 873 (M.D. Tenn. 2021) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  For Hieber to meet his burden, he must do more than make "generalized and vague allegations" that another employee was treated better than him.  *Stewart v. Esper*, 815 F. App'x 8, 17 (6th Cir. 2020) (quoting *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 147 (6th Cir. 2007)).

Hieber offers Paris as a comparator and argues that he was treated differently than Paris for similar conduct:

> Ms. Young made a complaint about M(r). Paris making a blatantly discriminatory comment towards Ms. Young's sexual orientation.  In violation of the Non-Discrimination Policy, Defendant did not initiate an investigation, interview employees from the Equalization Division, or gather statements and records

as part of a fact-finding process. Defendant did not
evaluate whether Mr. Paris' discriminatory comment
created a hostile work environment.  Most importantly,
Defendant did not discipline or terminate Mr. Paris'
employment for violating Defendant's Non-
Discrimination Policy.

(ECF No. 72, PageID.2327).  Hieber argues that Paris is a proper comparator

because Defendants purportedly terminated Hieber for violating the Non-

Discrimination Policy and this policy applies to all employees, regardless of

whether the employee is a member of management or a union.  (ECF No. 63-14,

PageID.1059).  Further, Hieber points out that Paris is also a managerial employee

that supervises other employees and was likewise alleged to have made a

discriminatory comment that would violate the Non-Discrimination Policy.

According to Hieber, because Paris, who is substantially younger than him,[5]

engaged in similar behavior and was treated more preferentially, there is a

genuine issue of material fact on this element.

---

[5] At the hearing, the court inquired whether there was evidence of Paris's age in the
record.  Counsel could not point to any such evidence.  Hieber has since filed a motion for the
court to take judicial notice of Paris's age, which is 44 years old.  (ECF No. 76).  This would place
Paris in the category of "substantially younger" than Hieber, who is 53 years old.  *See Grosjean
v. First Energy Corp.,* 349 F.3d 332, 340 (6th Cir. 2003) (An age difference of six years is not
significant, but an age difference of eight years is significant.).  However, as discussed below,
Paris is not a proper comparator, regardless of his age.

Defendants maintain that Paris is not proper comparator for several reasons. First, Hieber and Paris did not share a supervisor. Hieber was the head of the Equalization Department, and Paris was a supervisor—multiple "ranks" below Hieber and in Hieber's chain of command. (DH 193:21-24; AY 10:20-11:22). Defendants also argue that Hieber was alleged to have created a hostile work environment based on several offensive comments, while Paris made a single comment to Young, who was outside Paris's chain of command. Defendants also point out that Young's complaint was noted in Paris's personnel file, much like the outcome of Paris's first complaint, which did not result in disciplinary action against Hieber. (RW at 12:18-13:21).

In the court's view, the complaint made by Young about Paris and the 2020 complaint made by Paris about Hieber are so vastly different in scope and kind that it is not proper to compare Defendants' treatment of those complaints. As Defendants point out, the complaint about Paris was a single offensive remark made on one occasion and was not alleged to be part of a broader problem. In contrast, Paris's complaint about Hieber involved not just the allegedly discriminatory remarks made during the September 1, 2020 Zoom meeting, but was alleged to part of a "broader pattern of behaviors" that Paris believed evidenced Hieber's discriminatory intent based on age, sex, race, and gender.

(ECF No. 63-15).  Paris identified several circumstances in which he believed he was targeted by Hieber and two of Hieber's chiefs.  *Id*.  Paris described Hieber's bullying as a "long-standing problem."  *Id*.  How Defendants address a single offensive remark on one occasion is not comparable to the complaint lodged by Paris, which detailed an alleged pattern of long-term abusive behaviors by Hieber and his team.  Accordingly, the court concludes that Hieber has not shown that Paris "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).  Accordingly, Hieber's age discrimination claim must fail because he cannot show he was treated differently than a similarly situated person outside his protected class and has failed to establish a prima facie case.[6]

    C.    <u>Political Retaliation Claim</u>

Hieber's First Amendment retaliation claim is based on his affiliation with the Patterson administration.  (ECF No. 4, PageID.91-92, ¶¶ 139-140; DH at 202:16-23 (acknowledged by Plaintiff's counsel)).  Claims of retaliation based on political affiliation are evaluated under the same framework as claims based on

---

[6] Based on this conclusion, the court need not address Defendants' remaining arguments in favor of summary judgment.

protected speech.  *See Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021); *Papin v. Cnty. of Bay*, 2018 WL 6505363, at *6 (E.D. Mich. Dec. 11, 2018).  The plaintiff must show that: 1) he engaged in constitutionally protected conduct; 2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) a causal connection showing that the adverse action was motivated at least in part by his protected conduct.  *Kubala*, 984 at 1139 (quoting *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012).  In the political discharge context, protected activity includes adopting certain political beliefs, supporting a particular political candidate, or affiliating with a political party or group.  *Garvey v. Montgomery*, 128 F. App'x 453, 458 (6th Cir. 2005) (citing *Lucas v. Monroe County*, 203 F.3d 964, 975 (6th Cir. 2000) ("The First Amendment prohibits government officials from making employment decisions, such as hiring or firing, based on the employee's political beliefs, affiliation, or support.").  If the plaintiff meets this burden, the burden then shifts to Defendants "to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct."  *Eckerman v. Tenn. Dept. of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (citing *Sowards v. Loudon Cnty*, 203 F.3d 426, 431 (6th Cir. 2000)).

Defendants argue that Hieber's claim fails for several reasons.  First, they argue that Hieber identifies no protected conduct, such as where he "took sides" between Patterson and Coulter, voiced a lack of support for Coulter, or told Jen or Coulter about his political affiliation, or supported a candidate adverse to Coulter. Defendants also argue that there is no evidence that Defendants were aware of Hieber's political preferences.  In response, Hieber says there is circumstantial evidence that he was perceived to belong to a faction loyal to Patterson.  He points to evidence of the buyout incentive with the stated purposes of developing a new, nimble workforce.  According to Hieber, taking into account Lynch's comments, a jury could reasonably infer that Defendants were acting on a desire to rid itself of older, long-term employees that were politically loyal or affiliated with the Patterson administration.  Hieber argues that this perception is further supported by Paris's October 7, 2020 complaint, (which Defendants acted on), referencing the proximity to an election and the fact that "once again" the county could be under leadership that did not support diversity or an inclusive environment, suggesting that the Patterson regime and those associated with it did not.

The court agrees with Defendants that there is insufficient evidence of protected conduct.  There is no dispute that Defendants were aware that Hieber

was employed in his position during the prior administration.  However,

Defendants' awareness that Hieber was a non-politically appointed employee

during the Patterson administration is not sufficient to constitute protected

conduct in the absence of some other activity, statement of support, action or

speech by Hieber indicating his loyalty or support for the prior administration or

the Republican party, or evidence that Defendants so perceived Hieber in that

vein.  That is, this is only evidence that Hieber was employed during the last

administration, not that he was (or was perceived to be) loyal to the prior

administration or the Republican Party.  It is true that perceived affiliation, as

opposed to actual affiliation is sufficient, *see Dye v. Off. of the Racing Comm'n*,

702 F.3d 286, 299 (6th Cir. 2012), but there still must be evidence of that

perception.  Hieber has not pointed to any evidence in the record showing that

Defendants knew or believed him to be loyal to Patterson or affiliated with the

Republican Party.  In contrast, in *Dye*, affidavits detailed how the Racing

Commissioner (a Democratic appointee) accused certain stewards of supporting

the Republican candidate for governor and threatened to take away certain

benefits.  *Id*. at 300.  Other evidence set forth in affidavits detailed that

Democratically affiliated employees were treated more favorably than those who

were or were perceived to be affiliated with the Republican Party.  *Id*. at 301; *see*

*also id*. at 302 (There was ample evidence to support the stewards' contention that Defendants attributed a political affiliation to the stewards.).  Hieber offers no such similar evidence[7] and accordingly, the claimed protected conduct does not rise above mere speculation.  *See Kelly v. Warren County Bd. of Comm'rs*, 396 F. App'x 246, 250 (6th Cir. 2010) ("mere speculation does not create a genuine issue of material fact to overcome summary judgment").

D.    Due Process

Due process requires a pretermination hearing, the formality of which depends upon the importance of the interest and the nature of the subsequent proceedings.  *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004) (citing *Duchesne v. Williams*, 849 F.2d 1004, 1006–07 (6th Cir. 1988)).  For public employees who can only be fired for cause, the Supreme Court has held, specifically, that a pretermination proceeding is required.  *Id*. (discussing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, (1985)).  In *Loudermill*, the Supreme Court held that a full evidentiary hearing is not required prior to termination.  Rather,

---

[7] During the hearing Hieber's counsel pointed to Hieber's testimony that he was a member of Patterson's "Oakland County Executive Club," which was some type of political fundraising club.  (ECF No. 63-2, pp. 490-91).  However, Hieber did not testify that any of the decision makers involved in his termination were aware of his involvement in that club and counsel pointed to no evidence to support the notion that any decision makers had actual knowledge of his political affiliation or evidence to support any purported perception.

the pretermination hearing is to provide an initial check against mistaken conclusions, "essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id*. (quoting *Loudermill*, 470 U.S. at 545–46).  The essential elements required for due process are notice and an opportunity to respond, either in writing or in person.  *Id*. (citing *Loudermill*, 470 U.S. at 546).

More specifically, before the termination of a public employee who has a property interest in his employment, the due process clause requires that the employee be given "oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer."  *Id.* (quoting *Buckner v. City of Highland Park*, 901 F.2d 491, 494 (6th Cir. 1990)).  "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee."  *Loudermill*, 470 U.S. at 546.  The Sixth Circuit also held that at the pretermination stage, the employee does not have a right to, and the Constitution does not require, a neutral and impartial decisionmaker.  *Farhat*, 370 F.3d at 595.  The "right of reply" before the official responsible for the discharge is sufficient.  *Id*. (citing *Duchesne*, 849 F.2d at 1006).  Instead a neutral decisionmaker is needed to adjudicate the evidence at

the post-deprivation stage.  *Id*. at 595-96.  "Where there is a system of post-termination procedures available to the employee that includes a neutral decisionmaker and/or arbitration, coupled with a pretermination 'right of reply' hearing, then the employee has received all the process due under the Constitution."  *Id*. at 596 (citing *Duchesne*, 849 F.2d at 1006; *Buckner*, 901 F.2d at 494; *Loudermill*, 470 U.S. at 545).

Further, the law is well-established that it is the opportunity for a post-deprivation hearing before a neutral decisionmaker that is required for due process.  *Id*. at 596.  So long as the procedural requirements are reasonable and give the employee notice and an opportunity to participate meaningfully, they are constitutionally adequate.  *Id*.  Indeed, the "availability of recourse to a constitutionally sufficient administrative procedure satisfies due process requirements if the complainant merely declines or fails to take advantage of the administrative procedure."  *Id*. (quoting *Dusanek v. Hannon*, 677 F.2d 538, 542–43 (7th Cir. 1982) (citations omitted)).  Accordingly, "where the employee refuses to participate or chooses not to participate in the post-termination proceedings, then the employee has waived his procedural due process claim."  *Id*. (citing *Krentz v. Robertson Fire Prot. Dist*., 228 F.3d 897, 904 (8th Cir.2000) (citations omitted)).

Hieber argues that Defendants failed to provide him the constitutionally minimum pre-deprivation due process.  More specifically, Hieber argues that Defendants were obligated to provide him with not only notice of the charges against him and the evidence they had against him, but also provide him with an opportunity to respond.  According to Hieber, Defendants thwarted that opportunity by instructing Hieber through his attorney that the pre-deprivation hearing would not be a place to present his response.  On November 22, 2021, Woods wrote that "this is not the time that Mr. Hieber would plead his case, that would be done afterward through the Personnel Appeal Board process." (ECF No. 72-18).  Thus, Hieber maintains that Defendants failed to provide him an opportunity to respond by indicating the pre-deprivation hearing was not the time or place to do so; instead, Defendants used it only to provide Hieber notice, which is insufficient to meet the bare minimum due process requirements set forth in *Loudermill.*

As explained in *Farhat*, the due process clause requires that the employee be given "oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer."  370 F.3d at 595.  An evidentiary hearing at this stage is not required.  *Id*.  After he was placed on administrative leave, Hieber and his

33

counsel met with the County's corporate counsel on November 12, 2021

regarding the reasons he was placed on leave.  (ECF No. 64-18).  At this meeting,

with his attorney present, Hieber was given an extensive opportunity to present

his side of the story and respond to the allegations.  (ECF No. 64-18).

While this meeting was not the official *Loudermill* hearing, that does not

mean that it did not satisfy *Loudermill*'s mandate.  *Buckner v. City of Highland

Park*, 901 F.2d 491 (6th Cir. 1990) is instructive in this regard.  Buckner was a

police officer employed by the City of Highland Park.  *Id*. at 492.  He visited a

complaining witness at her home with a witness complaint form and proceeded

to interrogate her about her sexual activities and assaulted her.  Another officer

called and heard the witness demanding that Buckner leaver her apartment.  The

other officer reported the incident.  *Id*.  Buckner was informed of the complaint

and fled to the hospital saying he needed treatment for alcohol abuse after being

informed that the police chief wanted to speak with him.  *Id*.  An officer and a

union representative went to the hospital to interview Buckner, who refused to

comment on the allegations.  Buckner was then suspended with pay, pending

further investigation.  *Id*.  The police chief asked the union's chief steward to

advise Buckner of the charges against him and obtain his account of the incident.

The police chief advised the steward that he intended to discipline Buckner.  The

chief steward visited Buckner in the hospital, but he again refused to make any statement. *Id*. Eight days later, the police chief made a preliminary determination and recommended to the mayor that Buckner be discharged, which the mayor approved. *Id*. at 493. Buckner filed a grievance regarding his suspension and termination, claiming that he was denied procedural due process. *Id*. Buckner then filed suit claiming that his discharge violated his due process rights because a hearing was not held before his termination. *Id*. The district court found that Buckner was not provided pretermination due process in accordance with *Loudermill*. *Id*. During the pendency of the district court action, Buckner's grievance was submitted to arbitration. The arbitrator found that the due process standards of *Loudermill* were satisfied. *Id*.

The Sixth Circuit also found that *Loudermill*'s requirements were satisfied. *Id*. at 495. More specifically, the court found that the visits to Buckner in the hospital where he was confronted with the charges against him by the union representative and an officer, along with later visit by the steward satisfied the first two Loudermill requirements. *Id*. While these meetings lacked the formalities of the City's usual pretermination proceedings,[8] the officer who

---

[8] "The usual pre-termination process for discharging Highland Park police officers involved a meeting between Chief Ford, the officer against whom discipline was considered, and a union representative, at which the formal charges were discussed and Chief Ford heard the officer's views." *Id*. at 495.

represented the police chief served in virtually the same capacity as the chief

would have in the standard pretermination proceedings.  *Id*.  "The fact that the

union representatives and Lt. Holloway may have acted pursuant to the

provisions of the collective bargaining agreement or pursuant to a criminal

investigation does not in any way taint the oral and written notice Buckner

received, nor does it affect the fact that the charges were explained to him."  *Id*.

Moreover, Buckner was offered the opportunity to present his side of the story at

both meetings, satisfying the third element of *Loudermill.  Id*.

Again, as described above, Hieber was given the opportunity to present his

side of the story – which is all *Loudermill* requires – at the November meeting

with counsel.  Additionally, Heiber was afforded a second opportunity to tell his

side of the story at the formal *Loudermill* hearing.  The *Loudermill* hearing was

held on November 23, 2021, during which Hieber was informed again of the

reasons for his termination, and he acknowledged that he had been provided with

the County's bases for his termination.  (ECF No. 64-20 at 4:6-5:15).  Hieber and

his attorney were also provided with the opportunity to make a statement and

ask questions.  *Id*. at 5:16-23, 6:1-8.  Hieber was also told that "this is not the time

(Plaintiff) would plead his case, that would be done afterward through the

Personnel Appeal Board process."  (ECF No. 72-20; *see also* ECF No. 64-20, p. 6).

They were then informed that Hieber would have the opportunity to further challenge the action taken through a PAB hearing. *Id*. Despite this directive, Hieber was permitted to present a statement, respond to the allegations, and ask questions, which is all that is required by *Loudermill*. To the extent he complains that he was not permitted to present witness testimony, or proceed with an evidentiary hearing, that is not required under *Loudermill*. Accordingly, the court concludes that *Loudermill* was satisfied via both the pre-hearing meeting with counsel and the official *Loudermill* hearing.

Most notably, Hieber decided to not complete the PAB hearing, calling it a "waste of time." (DH at 383:9-384:2, 550:14-19). "The law is well-established that it is the opportunity for a post-deprivation hearing before a neutral decisionmaker that is required for due process. As long as the procedural requirements are reasonable and give the employee notice and an opportunity to participate meaningfully, they are constitutionally adequate." *Humphrey v. Scott Cnty. Fiscal Ct.*, 211 F. App'x 390, 392 (6th Cir. 2006) (quoting *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004) (citation omitted)). If the government provides this opportunity, and "the employee refuses to participate or chooses not to participate in the post-termination proceedings, then the employee has waived his procedural due process claim." *Id*. (citation omitted). Hieber's failure to take

advantage of the post-deprivation hearing process dooms his due process claim. *See id*. (The plaintiff waived his procedural due process claim by failing to pursue the administrative remedies provided by state law).

Hieber attempts to avoid this result by asserting that the post-deprivation hearing was rendered a "sham" based on several purported due process violations. A "sham" proceeding is one in which the outcome of the hearing is predetermined and thus does not afford due process. *Ross v. City of Memphis*, 394 F. Supp. 2d 1024, 1038–39 (W.D. Tenn. 2005) (citing *Wagner v. City of Memphis*, 971 F. Supp. 308, 318–19 (W.D. Tenn. 1997)). Sham proceedings "eviscerate the protection afforded to municipal employees under the Due Process Clause of the Fourteenth Amendment." *Wagner*, 971 F. Supp. at 319. Hieber makes several arguments in support of his claim that the PAB hearing was a sham.

First, Hieber says that the decision maker was not neutral because the Deputy County Executive was friends with one member of the PAB and thus, could not be impartial. However, Hieber has not developed any record to support any conflict of interest that might exist based on an alleged friendship between one PAB member and the Deputy County Executive. Hieber did not depose Lepler or Chambers and cites no authority suggesting that the email itself declaring

Lepler as Chambers' "bestie" is sufficient to support a conflict of interest. Thus, there was no due process violation on this basis.

Second, Hieber contends that Chairman Woodward had a conflict of interest because he sat on the PAB and the County's Finance Committee and Claims Committee, which rejected the settlement with Hieber.  It is difficult to imagine how Woodward could have had a conflict of interest in January 2022, when the PAB hearing took place, based on the failure to approve a settlement, the negotiations for which did not even begin until several months *later*, in the Spring of 2022.  (ECF No. 29, PageID.321, Plaintiff's Motion to Enforce Settlement) ("That in the spring of 2022, Defendants began settlement negotiations with Plaintiff.").  Thus, this purported conflict of interest could not have violated Hieber's right to due process.

Third, Hieber claims the PAB did not allow Hieber to call witnesses or issue subpoenas, and Jen's emails made employees scared to cooperate with Hieber. According to the PAB hearing transcript, Woodward made clear that all witnesses who submitted affidavits would be permitted to testify at a later date.  (ECF No. 64-25, PageID.1437).  Additionally, Defendants' counsel indicated that he would contact all witnesses that Hieber sought to have testify and inform them that the County was not prohibiting them from testifying and had no intention of having a

chilling effect on their attendance at the future hearing.  *Id*. at PageID.1441.  Prior

to the hearing, the County's corporation counsel also reassured Hieber's counsel

that he would "make all efforts possible" to ensure witness cooperation for

Hieber.  (ECF No. 64-28).  Again, the PAB members indicated, however, that the

PAB had no subpoena powers.  (ECF No. 64-25, PageID.1442).  Given that it was

anticipated that a future hearing would take place where Hieber's witnesses

would be able to testify, and the County's counsel made repeated assurances

regarding witness cooperation, the PAB did not refuse to allow him to call

witnesses and thus, did not deny due process in this regard.

Fourth, Hieber says the PAB refused to accept his affidavits.  The Procedural

Guidelines For Conducting Personnel Appeal Board Hearings specifically provides

that "[a]ffidavits of unavailable witnesses, which address non-substantive issues,

may be admitted by the Chair."  (ECF No. 64-19, PageID.1397).  Thus, under the

PAB Guidelines, affidavits on the substantive issues were not permitted.

Moreover, Hieber does not address the fundamental unfairness of allowing one

side to proceed via affidavit without the opportunity for cross-examination.  The

refusal to allow affidavits, particularly where such witnesses were allowed to

testify, did not violate Hieber's due process rights.

Fifth, Hieber says that Defendants failed to cooperate with his requests for documents.  At the PAB hearing, Hieber's counsel alleged that they never got any of the documents they requested.  (ECF No. 64-25, PageID.1439).  Hieber's counsel was not able to identify during the hearing on this motion any particular documents that he requested but did not receive.  It is clear from the PAB hearing transcript that each side provided exhibits in advance to the panel, although the precise documents are not specifically identified.  (ECF No. 72-23).  In the absence of Hieber's more precise identification of documents he did not receive before the PAB hearing, the court finds no due process violation.  Based on the foregoing, Hieber's claim that the purported violations rendered the PAB hearing a "sham" is unavailing and his due process claim must fail.

     E.   <u>Qualified Immunity</u>

Qualified immunity protects governmental officials from suit as long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The ultimate question is "whether a reasonable [official] could have believed [the challenged action] to be lawful, in light of clearly established law and the information [he] possessed."  *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  A qualified immunity analysis requires a two-pronged inquiry.  The

first prong addresses whether the facts, "when taken in the light most favorable

to the party asserting the injury, show the [defendant's] conduct violated a

constitutional right." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015).  The

second prong asks whether the right was "clearly established such 'that a

reasonable official would understand that what he is doing violates that right.'"

*Id*. (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

As set forth above in detail, the court finds Hieber's constitutional claims to

be without merit.  Accordingly, Hieber cannot satisfy the first prong of the test,

and Jen is entitled to qualified immunity.

F.    <u>Defamation</u>

Hieber's defamation claim is premised on Jen's October 22 and November

24, 2021 emails.  Defendants argue that Hieber cannot point to any language in

either email which was false or defamatory, instead calling the emails part of a

"witch hunt."  (DH at 434:16-436:20).  In the first email, Jen informed the entire

Equalization staff that Hieber was on leave and that "all employees have been

advised to work from home today and Monday."  (ECF No. 72-17).  Hieber argues

that the email suggested to employees that he was so dangerous that the County

had to modify its security measures for parking, entering, and exiting the building,

to protect employees from Plaintiff.  The second email advised that (1) Hieber was

asked to refrain from any type of contact with employees to report the nature of

contact to the HR/Labor Relations, (2) if Hieber appears on site to call 9-1-1, (3) if

Hieber appear at an employee's house to call 9-1-1, and (4) that new security

measures were in place regarding how employees are to enter the building.  (ECF

No. 72-22).  Hieber contends that Jen's email implied that Hieber was a danger,

and that as such precautionary measures were being instituted.

Defamation (based on implication or otherwise) requires: 1) a false and

defamatory statement concerning the plaintiff, 2) an unprivileged communication

to a third party, 3) fault amounting to at least negligence on the part of the

publisher, and 4) either actionability of the statement irrespective of special harm

… or the existence of special harm caused by publication.  *Kevorkian v. American

Med Ass'n*, 237 Mich. App. 1, 8; (1999); *see also Vollmar v. Laura*, 2006 WL

1008995, *4 (Mich. App. Apr. 18, 2006) (statements by board member that

someone did something illegal and unethical while implicating plaintiff were

insufficient to sustain defamation claim).  Expressions of opinion are protected

from defamation actions.  *Hodgins v. Times Herald Co*., 169 Mich. App. 245, 253–

54 (1988) (citing *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 339 (1974)).  However,

there is no constitutional protection given to false statements of fact, so false

statements of fact are not protected from libel suits.  *Id.* (citing *Gertz*, 418 U.S. at

340).  Direct accusations or inferences of criminal conduct or wrongdoing are not

protected as opinion.  *Id*. (citing *Church of Scientology of California v. Flynn*, 744

F.2d 694, 698 (9th Cir. 1984); *Cianci v. New Times Publishing Co*., 639 F.2d 54, 65

(2d Cir. 1980)).  However, exaggerated language used to express opinion, such as

"blackmailer," "traitor," or "crook," does not become actionable merely because

it could be taken out of context as accusing someone of a crime.  *Id*. (citing

*Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 14 (1970)).

In *Hodgins*, the court examined whether the defendant's statements

constituted an unprotected accusation of criminal conduct or use of more generic

language that does not constitute accusing someone of a crime.  The letter at

issue in *Hodgins* implied that plaintiffs sold animals to be used to train dogs for

dog fights, stating: (1) "Dog Pound animals are sold not only to hospitals (which

are not necessarily humane) but to anyone with Mr. Hodgins' asking price."; and

(2) "Some of the more frail dogs and some of the kittens and cats end up as

'training animals' to be killed by dogs being trained for the many dog fights staged

weekly in the state."  *Id*. at 249-50.  The court concluded that the letter at issue in

*Hodgins* accused implied that the plaintiff sold dogs to people who use them for

dog fights, a crime under Michigan law and federal law.  *Id*. at 254.  The court held

that the "language accuses or strongly implies that plaintiffs are involved in illegal

or wrongful conduct involving dog fighting and moves across the line dividing

strongly worded opinion from accusation of crime" and thus, the "statements are

not protected by the First Amendment from libel suits." *Id*.

Nothing in Jen's emails accused Hieber of having committed a crime or is

otherwise false. *Hamilton v. Jeannot*, 2015 WL 5167914, at *9 (Mich. Ct. App.

Sept. 3, 2015) ("[A] defamatory statement must be provable as false to be

actionable.") (citation omitted). Instead, the emails were limited to notifying

County personnel of the actions they should take if Hieber appeared on County

property or at their home, since he was barred from County property and from

contacting employees. At worst, the emails suggest Jen's opinion about Hieber's

possible future conduct, not a false statement about his actual conduct.

*Lakeshore Cmty. Hosp., Inc. v. Perry*, 212 Mich. App. 396 (1995) (expressions of

opinion are not actionable in defamation); *Cenveo Corp. v. CelumSolutions*

*Software GMBH & Co. KG*, 504 F. Supp. 2d 574 (D. Minn. 2007) ("the statement ...

is a statement about future events and therefore does not imply the existence of

a fact"). Such statements about future conduct are not actionable. For example,

in *Hamilton v. Jeannot*, the court noted that an opinion that the plaintiff was

unemployable in the future in Benzie County was a subjective opinion that could

not be verified. *Id*. at *9. However, when accompanied by the statement that the

plaintiff was unemployable because he "burned too many bridges," it was implied

that the plaintiff engaged in inappropriate conduct that would justify members of

the community refusing to do business with him, given that the phrase "burned

too many bridges" means the person abused their relationships with others so as

to justify severing the relationships. *Id*. Here, any implication of future wrongful

conduct by Hieber that could be made from Jen's emails is not accompanied by

any opinion of past wrongful conduct. *See e.g., WCP/Fern Exposition Servs., LLC v.

Hall*, 2011 WL 1157699, at *13 (W.D. Ky. Mar. 28, 2011) (Statement "qualifies as

privileged opinion because it was simply a prediction about a possible future

event; it thus could not be grounded in any fact, much less a defamatory one, and

is protected as pure opinion."). Accordingly, the emails are not defamatory.

Hieber's claim for defamation must, therefore, fail.

Additionally, Jen's emails are protected by qualified privilege.[9] Qualified

privilege is an immunity to defamation that exists between people who have an

interest in the subject matter of the communication. *Smith v. Fergan*, 181 Mich.

---

[9] Hieber argues that Defendants failed to sufficiently raise qualified privilege as a defense in this matter. In Affirmative Defense No. 18, Defendants stated any and all statements made were absolutely privilege or protected by qualified privilege. (ECF No. 9, PageID.129). Hieber argues that Defendants did not note what privilege they were raising as a defense. It seems obvious in a case where a defamation claim is asserted, that a defense of qualified privilege applies to the defamation claim. Accordingly, the court finds that Defendants sufficiently raised this affirmative defense.

App. 594, 597 (1989).  The elements of qualified privilege are: 1) good faith; 2) an interest to be upheld; 3) a statement limited in scope to this purpose; 4) a proper occasion; and 5) publication in a proper manner and to proper parties only."  *Id*. An employer has the "qualified privilege to defame an employee by publishing statements to other employees whose duties interest them in the same subject matter."  *Id*.

Defendants argue that Hieber offers no facts suggesting that Jen sent the emails in bad faith.  Defendants argue that Jen had a clear interest in promoting the safety of County employees and simply conveyed safety protocols to employees of the Equalization department only.  *See e.g.*, *Greggs v. Andrews Univ.*, 2003 WL 1689619, at *6 (Mich. Ct. App. Mar. 27, 2003) (statements made by residence hall advisor to students that another student was "immoral" and "had been involved in a rape" not actionable as defamatory because qualified privilege applied to communication between those with a "shared interest" in safety).  In response, Hieber again argues that the statements imply that he would engage in criminal behavior, such as trespassing on County property and possibly physically threatening employees at their worksite or at home.  Thus, he contends that a reasonable juror could conclude that Defendant Jen intentionally made the false implications for an ulterior purpose, such as harming Hieber or scaring

employees away from assisting him in any appeal of his termination.  For the

same reasons set forth above, the court rejects Hieber's claims that the

statements in the emails were false or that they suggest that Hieber has or would

necessarily engage in criminal behavior.  Hieber has not pointed to any evidence

that would contradict Defendants' evidence that the emails were sent in good

faith and otherwise satisfy the test for qualified privilege.

**IV.    CONCLUSION**

For the reasons set forth above, Defendants' motion for summary

judgment is **GRANTED**.

**SO ORDERED**.

Date: March 27, 2024                           <u>s/F. Kay Behm</u>
                                               F. Kay Behm
                                               United States District Judge